638 A.2d 931

RESOLUTION TRUST CORPORATION AS RECEIVER FOR CITY
SAVINGS, F.S.B., PLAINTIFF, v. WILLIAM LANZARO,
SHERIFF OF MONMOUTH COUNTY, DEFENDANT.

Superior Court of New Jersey
Chancery Division Monmouth County

Decided May 28, 1992.

*Harold J. Cassidy* for plaintiff (*Cassidy, Foss and San Filippo*
attorneys; *Mary Ellen Edwards* and *Rick Brodsky,* on the briefs).

*Malcolm V. Carton,* Monmouth County Counsel, for defendant; *Frederick P. Niemann,* on the brief.

McGANN, J.S.C.

In this action the Resolution Trust Corporation ("RTC") seeks a ruling that the sheriff is not entitled to collect the statutory fee allowed him for conducting an execution sale, together with an order compelling the sheriff to deliver to the RTC his deed resulting from that execution sale, despite the non-payment of his fee.

The background for this case is found in the matter of *Resolution Trust Corporation, as Receiver for Cities Savings, F.S.B. v. Stony Hill Associates, a New Jersey Partnership,* Docket No. F–11672–90. In that action, final judgment in foreclosure in favor of RTC was entered on May 31, 1991. It provided for sale of the property (a 376 unit residential apartment complex on 27 acres of land) and directed that there be paid from the net proceeds thereof the following sums in the order indicated:

First. Plaintiff (RTC): $13,446,065.52 together with interest, counsel fees and costs.

Second. Provident Associates: $5,723,220.74 with interest.

Third. Plaintiff (RTC): $3,370,178.50 with interest.

A writ of execution was obtained and delivered to the sheriff. Levy of the execution was made on the property. The sale was duly advertised and scheduled for September 16, 1991. On that day when the sale was called by the sheriff, active, competitive bidding took place between the holder of the second mortgage and the RTC. RTC's initial bid was $100. Bidding progressed until the last bid of the competitor was made for $10,925,000. RTC's bid of $11,000,000 was the highest received and it was declared the successful bidder. Thereafter the sheriff advised counsel for the RTC that the deed had been prepared and would be delivered upon payment of his fee of $275,075 as allowed by *N.J.S.A.* 22A:4–8.

At that point the RTC filed this action putting at issue the right of the sheriff to collect that fee. By agreement of counsel and pending resolution of the issue, the demand for payment of the fee has been restrained; the sheriff has been enjoined from re-advertising the sale. It is agreed that if the RTC is successful the sheriff will deliver his deed. If the RTC does not prevail it will pay the fee pending any appeal.

The return date of the order to show cause was extended to allow for necessary discovery. Extensive briefs have been filed by both sides. There is no issue of material fact. The matter is ripe for summary judgment.

*N.J.S.A.* 22A:4–8 is a statute which sets the fees to be paid to a sheriff for providing many and varied services. Among them are those related to execution sales. Pertinent to this case is the following:

> When a sale is made by virtue of an execution the sheriff shall be entitled to charge the following fees: On all sums not exceeding $5,000.00, 4%; on all sums exceeding $5,000.00 on such excess, 2½%; the minimum fee to be charged for a sale by virtue of an execution, $20.00.

The advertised notice of sale, as well as the conditions of sale sent to the RTC and publicized in the presence of all prospective bidders before the auction commenced, gave notice to all that the sheriff's fees were to be paid by the successful bidder in addition to the amount of the bid.[1]

In syllogistic form the RTC's position is this: Congress has exempted the RTC from the payment of any taxes (save local real estate taxes); the sheriff's fee is in the nature of a tax; therefore, the RTC is not required to pay it.

RTC relies on Sec. 2[15](b)(1) of the Federal Deposit Insurance Act (FDIA), 12 *U.S.C.A.* § 1825(b)(1), which provides:

> When acting as a receiver, the following provisions shall apply with respect to the Corporation:

---

[1] Cf. *The Howard Savings Bank v. Sutton,* 246 *N.J.Super.* 482, 587 A.2d 1335 (Ch.Div.1990).

(1) The Corporation including its franchise, its capital, reserves, and surplus, and its income, shall be exempt from all taxation imposed by any State, county, municipality, or local taxing authority, except that any real property of the Corporation shall be subject to State, territorial, county, municipal, or local taxation to the same extend according to its value as other real property is taxed, except that, notwithstanding the failure of any person to challenge an assessment under State law of such property's value, such value, and the tax thereon, shall be determined as of the period for which such tax is imposed.

In a Statement of Policy Regarding the Payment of State and Local Property Taxes,[2] the RTC expresses the following view of its liability for taxes:

SUMMARY: After considering (1) the powers granted to it under the Constitution and Federal law, (2) its obligation to maximize recoveries from the disposition of financial institutions and their assets, and (3) the potential effect of its actions upon state and municipal tax schemes, the Resolution Trust Corporation (the 'Corporation') has issued the following policy statement to provide guidance as to how it will administer its statutory responsibilities in this area.

. . . .

The Corporation is immune from taxes other than ad valorem real property taxes. Taxes on sales, transfers,[3] or other dispositions of Corporation property are generally in the nature of excise taxes which are levied on the transaction and not on the property (although the calculation of the amount of tax may be based on the property's sale price); the Corporation is immune from such taxes.

The RTC, as receiver, took title to the assets of Citizens Savings F.S.B. One of those assets was the debt owed by Stony Hill Associates to Citizens Savings together with the mortgage which secured the debt. In the language of the Federal statute that asset is part of the RTC's "capital." Just as clearly, however, the statutory fee allowed to the sheriff is not a direct tax on anyone's capital, including that of the RTC. Congress contemplated that in furtherance of its mandate, the RTC would have to pursue various state remedies and pay required state fees. It instituted the foreclosure action and paid a filing fee. No one suggests that the filing fee is a tax. It paid a fee for the writ of execution and

---

[2] 26 Fed.Reg. 28426 (1991).

[3] The Division of Taxation of the New Jersey Department of the Treasury has advised the R.T.C. that it is exempt from the tax imposed by the New Jersey Realty Transfer Fee Act pursuant to New Jersey legislative enactment (*N.J.S.A.* 46:15–10(b)).

makes no claim that such fees is a form of taxation. It used the services of the sheriff in advertising and conducting a public auction of the subject property and now claims that fee is in the nature of a tax and refuses to pay it.

The sheriff, in rendering his service, is entitled by statute to the equivalent of a limited auctioneer's commission on the sale. The standard conditions of sale used by the sheriff require the successful bidder to pay that fee. In commencing the foreclosure action in Monmouth County the RTC knew that as part of the final step (the auction sale) it might have to pay a fee to the sheriff if, but only if, it was the high bidder. If another party became the successful bidder, that person would pay the fee and the RTC would receive the full amount bid in reduction of the debt owed to it. Here, there was very competitive bidding. The RTC decided to be the highest bidder to take title (rather than money) and thereby control the timing of a later resale at a better price. That may very well be in the best interest of its overall mission; however, the RTC's decision does not cause the sheriff's fee to become a "tax." The fact that the RTC is liable for the sheriff's fee springs from a series of decisions made by it and not from state action aimed at the RTC. Under those circumstances the payment of the sheriff's fee is simply a cost in the furtherance of its business, similar to the fees it pays its lawyers, appraisers, property managers and other like professionals.

Therefore, it cannot be said that the payment of a fee in the nature of an auctioneer's commission is the equivalent of an excise tax on capital within congressional intent or within the RTC's Statement of Policy.[4] Ever since *McCulloch v. State of Mary-*

---

[4] The inference is reasonable that the RTC has chosen this sale as a test case because of the size of the resulting fee. It is a matter of judicial notice that the RTC in furtherance of its mandate has been an active litigant in New Jersey courts, has conducted many foreclosure actions, and has mounted no direct attack on *N.J.S.A.* 22A:4–8. Instead, it uses this forum to challenge a specific fee charged by one sheriff of the twenty one in New Jersey. This case is a challenge based on the numerical result, not on the public policy of the statute. If the RTC

*land,* 17 *U.S.* (4 *Wheat* ) 316, 4 *L.Ed.* 579 (1819), it has been clear that the states, in exercising their powers of taxation, cannot tax the powers, operations or property of the United States. See also *James v. Dravo Contracting Co.,* 302 *U.S.* 134, 58 *S.Ct.* 208, 82 *L.Ed.* 155 (1937); *United States v. Allegheny County,* 322 *U.S.* 174, 64 *S.Ct.* 908, 88 *L.Ed.* 1209 (1944). The RTC uses the result in this foreclosure sale, i.e., its obligation to pay a sheriff's fee of $275,075, as an appealing springboard for the argument that a "fee" of such magnitude cannot be recompense for services rendered but must in fact be such an impairment of RTC's capital as to be a "tax" and, therefore, constitutionally unenforceable.

Deposition discovery revealed that the sheriff's services in connection with an execution sale bear no relation to the amount realized at the sale. His procedures are the same whether the amount actually bid is large or small. His office receives and records the writ; makes the levy on the property; prepares and directs publication of the notice of sale; attends to any adjournments; conducts the auction; accounts for the receipt of monies; prepares the deed; and makes return on the writ. Various employees of the office and the sheriff devote about 10 hours of time to those tasks. RTC notes that the fee of $275,075 in this case results (arithmetically) in an hourly charge of $25,507.50. From that it urges that the court's sense of what is fair and just should be so shocked as to decide that the "fee" becomes an unenforceable tax.[5] The argument is overly simplistic.

The RTC refers to a line of cases in this State which hold that when municipalities set license charges and fees at a level which

---

truly believes that *N.J.S.A.* 22A:4–8 is unconstitutional under federal standards it should institute a declaratory judgment action against the State either in the Superior Court or in the Federal District Court for the District of New Jersey.

[5] Lest one be carried away by the enormity of this fee it must be kept in mind that an $11,000,000 bid is most unusual. The sheriff, under the formula of *N.J.S.A.* 22A:4–8 receives $20 on a $100 bid; $2,575 on a $100,000 bid; $12,575 on a $500,000 bid. The statutory percentages are much lower than the usual charge of 10% made by a private auctioneer.

generates funds beyond those reasonably related to the cost of regulation of that activity, they become a mechanism for raising general funds (an authorized tax) and are therefore unconstitutional. *Salomon v. Jersey City*, 12 *N.J.* 379, 384, 97 *A.2d* 405, (1953); *Bellington v. Township of East Windsor*, 17 *N.J.* 558, 565, 112 *A.2d* 268, (1955); *Daniels v. Point Pleasant*, 23 *N.J.* 357, 129 *A.2d* 265 (1957); *Moyant v. Paramus*, 30 *N.J.* 528, 547, 154 *A.2d* 9 (1959); *Holmdel Builders Ass'n v. Township of Holmdel*, 121 *N.J.* 550, 582, 583 *A.2d* 277 (1990). Those cases are not apposite in the issue here, for they deal with municipal abuse of the legislative grant of the power to tax.

Here, the state legislature has created the fee structure recognizing the particular services rendered by the sheriff, among which is the conduct of execution sales. Those fees are not exorbitant. They have a most reasonable relationship to the cost of maintaining all of the functions of a constitutional officer. The fees are not intended to generate general revenues. They do not partake of the nature of a "tax" but rather of that of a "fee": compensation for services rendered. The Legislature is presumed to know the difference between the two. It used the term "fee" and that fact, in itself, is significant. *Werner Machine Company v. Director of Division of Taxation*, 31 *N.J.Super.* 444, 449, 107 *A.2d* 36 (App.Div.1954) *aff'd* 17 *N.J.* 121, 110 *A.2d* 89 *aff'd* 350 *U.S.* 492, 76 *S.Ct.* 534, 100 *L.Ed.* 634 (1956).

The Sheriff has no power to tax. That power resides in the Legislature by concession of the people. (*N.J.Const.* art. IV, § 6, ¶ 1). In turn, the Legislature has granted limited tax power to counties (*N.J.S.A.* 40:23-7) and municipalities (*N.J.S.A.* 40:48-7).

The office of sheriff is unique in New Jersey. Established in early medieval times in England, the position is firmly embedded in our present constitution (*N.J.Const.*, art. VII, § 2, ¶ 2) as well as that of 1844 and of 1776. In 1776 the sheriff was clothed initially with all of the powers and responsibilities of a sheriff at common law. Over the years those duties and responsibilities have been altered, amended, and added to by legislative enact-

ment. *Virtue v. Board of Freeholders of Essex County,* 67 *N.J.L.* 139, 50 *A.* 360 (Sup.Ct.1901). As an examination of the general index to the New Jersey statutes reveals, those powers and duties are many. A good synopsis of the Monmouth County sheriff's activities is presented by Exhibit A appended hereto, taken from the descriptive portion of the 1992 Monmouth County budget.

Prior to 1905 the sheriff supported himself and his office by fees allowed by the Legislature. Among those fees were commissions for conducting execution auction sales. In that year the Legislature enacted the predecessors of *N.J.S.A.* 40A:9–104 and 105 and required the counties to pay their sheriffs' salaries and expenses. However, each sheriff was then obliged to remit all fees collected to the county treasurer. *Freeholders of Hudson v. Kaiser,* 75 *N.J.L.* 9, 69 *A.* 25 (Sup.Ct.1907), *aff'd* 76 *N.J.L.* 829, 71 *A.* 1133 (E & E 1908). That scheme prevails today. *N.J.S.A.* 40A:9–104, 105; *N.J.S.A.* 22A:4–17.

The services for which the sheriff is entitled to receive fees are listed in *N.J.S.A.* 22A:4–8 and 10. They are many and varied. The amount of each allowable fee is, significantly, set by the Legislature, although when collected they are to be turned over to the county.[6] There are many services required of the sheriff for which no fees are allowed by statute.

Appended hereto as exhibit B is an extract from the 1992 Monmouth County budget showing the following revenue figures attributable to the sheriff's office.

| 1992 Anticipated | 1991 Anticipated | 1991 Realized in cash |
|---|---|---|
| $750,000.00 | $700,000.00 | $922,907.74 [7] |

---

[6] *N.J.S.A.* 22A:4–17 in pertinent part provides: "All fees, costs, allowances, percentages and other perquisites of whatever kind which ... sheriffs or persons employed in their offices are entitled to charge and receive .... shall be for the sole use of the county and shall be accounted for regularly to the county treasurer...."

[7] This unanticipated figure is clearly attributable to the fact that Monmouth County led the State in foreclosure actions in 1991.

Exhibit C is an extract of the budgetary provisions for the sheriff's office with the following totals:

| 1991 Budget | 1992 Requested Budget | 1992 Approved Budget |
|---|---|---|
| $2,280,776.00 | $2,445,168.00 | $2,445,168.00 |

Fees collected thus represent roughly one-third of the cost of running the office. Based on the fee schedule set forth in *N.J.S.A.* 22A:4–8 and 10, it is apparent that the fees from execution sales provide the bulk of the revenues generated by the office.

And so, the sheriff collects fees set by state statute but remits the funds to county government. In turn, county government has the burden of fully funding the duties of the sheriff as mandated by state law yet receives only a fraction of that cost from sheriff's fees. It is a somewhat anomalous situation caused by a combination of ancient history, constitutional mandate and legislative activity. In that scheme the sheriffs are neutral parties. They cannot raise their fees. They are completely dependent on the freeholders to fund their offices. It cannot be said that their fees, any more than those of the county clerk, surrogate or Clerk of the Superior Court, are ill-disguised revenue raising "taxes".

For those reasons, I find that the RTC has not established a cause of action. Accordingly, the restraint previously entered is dissolved; the RTC is directed to pay the sheriff's fee and the complaint is dismissed.

Mr. Niemann will submit the appropriate judgment.

EXHIBIT A

DEPARTMENT: Regulation

AGENCY NAME: Sheriff's Office

AGENCY CODE: 03010

STATEMENT OF OBJECTIVES

The objectives of the Sheriff's Office are to provide expedient services to the courts, attorneys and the County of Monmouth with all its interrelated agencies. Project Ident–A–Kid demonstrates a perfect example of cooperation between various agencies;

Vocational Board, County Administrator's Office, Police Chiefs, I.D. Department, Public Information and the Sheriff's Office. The goal and objective of the Monmouth County Sheriff's Officers is to protect life and property in the Monmouth County Courthouse, the Courthouse, the Courthouse grounds, and the entire County; to provide services to the public and other county agencies of a non-criminal nature; to provide an efficient and effective court security system in accordance with the Judiciary/Sheriff Liaison Committee to the New Jersey Supreme Court, to detect criminal activities and arrest violators; to prevent unlawful activities in the Courthouse, the Courthouse grounds and the entire county and arrest violators; to educate the residents of the county in child safety, Senior Citizen safety and crime prevention in general. Also, to supply all law enforcement agencies with missing persons information and assist in missing persons investigations. The ultimate goal is to make the Monmouth County Courthouse and County, a safe place to live and work.

The principal goal of the Identification Bureau is to provide complete and current criminal history information and identification records for all Monmouth County law enforcement agencies. This includes supplying information to local, state and federal agencies which will enable Monmouth County to remain current in all law enforcement systems. The Bureau is responsible for the investigation of all criminal justice personnel in the county in order to maintain the integrity of the various law enforcement agencies and for the protection of the citizens of Monmouth County. The Identification Bureau is responsible for the processing of all inmates committed to Monmouth County Correctional Facility for the purpose of positive identification, checking for outstanding warrants, and holding the records of their incarceration for future investigations by other agencies.

PRINCIPAL ACTIVITIES

The Sheriff's Office is responsible for Summons/Complaints, Fees, Bench Warrants, Writs of Possession, Writs of Attachment, Re-

plevin, etc, Writs of Execution, Levies, Wage, Personal Property, Foreclosure, Sale of real property, bookkeeping, Petit Jury, Grand Jury and monies from all areas within the Sheriff's Department, Civil Warrants, Courtroom security, Transportation of inmates to the Courthouse, Process Servers for Civil Subpoenas, Summons on Complaint, Notice of Motions, Summons on Indictment. The Sheriff's Officers are responsible for Juvenile Orders of Arrest, Beach Inspections (Private Clubs) and Temporary Restraining Orders (Domestic Violence), providing security officers in all criminal courts and other courts on request, investigating all criminal activities in the Courthouse and grounds, providing prisoner transportation and escorts through the Courthouse, serving all Attorney Warrants, Fugitive Warrants and other criminal and civil processes, maintaining missing person repository for the entire County, assisting other law enforcement agencies on request and providing security at County owned facilities in times of strikes or other strife. Every citizen of Monmouth County receives direct and indirect benefits from these services. The officers further provide personnel for community service activities such as the County Fair, Crime Prevention, Ident–A–Kid program, our new Missing and Exploited Children program and the Chamber of Commerce.

The Identification Bureau is the central repository of all Monmouth County criminal history information, fingerprinting and photographing of all inmates committed to the Monmouth County Correctional Institution. The Bureau provide criminal history information to various law enforcement agencies through access to state computer files, assist outside investigations as state qualified fingerprint and photograph experts, and process all Monmouth County applicants for the criminal justice purposes to check for prior criminal records. State qualified personnel are available to instruct fingerprinting at the Monmouth County Police Academy and wherever else necessary.

They investigate applicants for the United States Armed Forces, and respond to suspected incidents of child abuse and photograph

the children for investigative purposes. Physical line-ups are conducted for all law enforcement agencies. The Bureau organizes and carries out "Ident-A-Kid" programs throughout the county, they also handle parole and probation investigations. The Sheriff's Emergency Response Team (S.E.R.T.) consists of officers trained to respond to hostage and other similar emergency situations which may occur at the courthouse.

### EXHIBIT B
#### ANTICIPATED REVENUES 1992 and 1991

| GENERAL REVENUES | 1992 ANTICIPAT- ED | 1991 ANTICIPAT- ED | 1991 REAL- IZED IN CASH |
|---|---|---|---|
| FUND BALANCE: | $12,300,000.00 | $11,500,000.00 | $11,500,000.00 |
| MISCELLANEOUS REVE- NUES: | | | |
| County Clerk | $3,500,000.00 | $3,500,000.00 | $3,531,047.70 |
| Surrogate | $300,000.00 | $300,000.00 | $331,498.96 |
| Sheriff | $750,000.00 | $700,000.00 | $922,907.74 |
| County District Court | $400,000.00 | $350,000.00 | $503,989.65 |
| Probation Department | $25,000.00 | $21,000.00 | $73,344.85 |
| Board of County Patients in State and Other Institutions | $43,400.00 | $135,717.00 | $616,860.36 |
| State Aid-County College Bonds | $1,168,522.50 | $1,176,972.50 | $1,176,972.50 |
| Interest on Investments and Deposits | $3,500,000.00 | $3,500,000.00 | $5,163,575.79 |
| State Aid-County Vocational School Bonds | $225,812.50 | $234,062.50 | $234,062.50 |
| Parks and Recreation | $3,200,000.00 | $3,000,000.00 | $3,436,735.67 |
| Geraldine L. Thompson Medical Home | $3,660,000.00 | $4,575,000.00 | $3,664,105.70 |
| John L. Montgomery Medical Home | $8,360,000.00 | $7,670,000.00 | $8,360,499.74 |
| Data Processing Services- Board of Social Services | $138,165.00 | $155,000.00 | $154,158.12 |
| Superior Court Fees | $250,000.00 | $200,000.00 | $297,495.00 |
| Voting Machine Rentals | $15,000.00 | $12,000.00 | $15,232.50 |
| Primary Election-Postage Reimbursement by Municipalities | $30,000.00 | $29,000.00 | $34,819.79 |
| Bail Bond Forfeitures | $100,000.00 | $75,000.00 | $274,550.00 |
| Receipts, Rental of County Owned Properties | $25,000.00 | $50,000.00 | $32,200.00 |
| Interest on County Clerk's Investments | $100,000.00 | $125,000.00 | $108,860.73 |
| Indirect Cost Recovery | $600,000.00 | $590,000.00 | $617,823.04 |
| USDA Reimbursement, Youth Detention Center | $35,000.00 | $32,000.00 | $42,369.45 |

| | ANTICIPATED REVENUES 1992 and 1991 | | |
| GENERAL REVENUES | 1992 ANTICIPAT-ED | 1991 ANTICIPAT-ED | 1991 REAL-IZED IN CASH |
|---|---|---|---|
| Reimbursement, Mental Health Administrator's Salary | $12,000.00 | $12,000.00 | $12,000.00 |
| Maintenance–in–Lieu–of–Rent, Board of Social Services | $980,971.00 | $980,972.00 | $980,971.92 |
| Recovery of Fringe Benefits | $1,750,000.00 | $1,800,000.00 | $1,801,006.72 |
| Reimbursement of Title IV–D Program | $1,700,000.00 | $1,600,000.00 | $1,873,684.08 |
| Reimbursement, State Inmates at Correctional Institution | $1,800,000.00 | $1,225,000.00 | $2,392,007.40 |
| Lease, Workers' Compensation Court | $73,404.00 | $73,404.00 | $73,404.00 |
| Office of Emergency Management | $25,000.00 | $30,000.00 | $25,000.00 |
| Intoxicated Driver Resource Center | $186,000.00 | $186,000.00 | $190,915.00 |
| STATE AND FEDERAL REVENUES OFFSET WITH APPROPRIATIONS: | | | |
| Grants (see pages for detail) | $11,111,200.18 | $16,320,267.92 | $9,941,550.51 |
| OTHER SPECIAL ITEMS: | | | |
| Motor Vehicle Fines | $990,374.02 | $906,142.97 | $906,142.97 |
| Accrued Interest on Bonds/Notes | $79,466.15 | $105,447.92 | $105,447.92 |
| Monmouth County Reclamation Center Utility–Equipment Leases | $2,414,803.00 | $2,414,803.00 | $2,414,803.00 |
| Open Space Preservation Tax | $3,751,363.75 | $3,750,103.75 | $3,746,903.95 |
| State of N.J.–Social Service Reimbursement | $16,464,890.00 | $13,157,589.00 | $13,028,272.04 |
| Division of Social Services | $21,010,152.00 | $1,114,224.00 | $1,098,105.78 |
| SUBTOTAL GENERAL REVENUES | $101,075,524.10 | $81,606,706.56 | $79,683,325.08 |
| AMOUNT TO BE RAISED BY TAXATION–COUNTY PURPOSE TAX | $169,630,000.00 | $162,633,504.00 | $162,633,504.00 |
| TOTAL GENERAL REVENUES | $270,705,524.10 | $244,240,210.56 | $242,316,829.08 |

## EXHIBIT C

DEPARTMENT: Regulation
AGENCY NAME: Sheriff's Office
AGENCY CODE: 03010

| LINE ITEM CODE | LINE ITEM NAME | 1991 BUDGET (as of Dec. 31) | 1992 REQUESTED BUDGET | 1992 APPROVED BUDGET |
|---|---|---|---|---|
| 1000 | SALARIES & WAGES POSITIONS | 76 | 76 | 76 |
| 1101 | Base Pay | $2,062,815.00 | $2,248,709.00 | $2,248,709.00 |
| 1201 | Part Time | $0.00 | $5,016.00 | $5,016.00 |
| 1207 | Seasonal/Emergency | $1,700.00 | $0.00 | $0.00 |
| 1301 | Overtime | ·$62,100.00 | $45,000.00 | $45,000.00 |
| 1999 | TOTAL SALARIES & WAGES | $2,126,615.00 | $2,298,725.00 | $2,298,725.00 |
| 2000 | OTHER EXPENSES | | | |
| 2130 | Jurors & Witness Fee & Exp | $18,900.00 | $17,500.00 | $17,500.00 |
| 2143 | Phone & Telegraph Services | $0.00 | $0.00 | $0.00 |
| 2202 | Const & Maint Mater & Supp | $1,480.00 | $1,975.00 | $1,975.00 |
| 2223 | Emergency and Safety Materials | $950.00 | $1,150.00 | $1,150.00 |
| 2224 | Fuels, Chemicals & Gases | $700.00 | $700.00 | $700.00 |
| 2229 | Drugs & Medical Supplies | $0.00 | $0.00 | $0.00 |
| 2240 | Dry Goods & Janitorial Supp | $4,815.00 | $4,212.00 | $4,212.00 |
| 2244 | Stationery and Office Supplies | $18,730.00 | $21,000.00 | $21,000.00 |
| 2269 | Guns & Firearms Supplies | $22,241.00 | $21,356.00 | $21,356.00 |
| 2312 | Specialized Services | $330.00 | $330.00 | $330.00 |
| 2319 | Equip & Property Rentals | $725.00 | $820.00 | $820.00 |
| 2323 | Equip & Veh Maint & Repair | $4,293.00 | $3,890.00 | $3,890.00 |
| 2324 | Medical Services | $4,200.00 | $3,500.00 | $3,500.00 |
| 2342 | Computer Services | $0.00 | $0.00 | $0.00 |
| 2360 | Advertising | $0.00 | $500.00 | $500.00 |
| 2362 | Printing & Bookbinding | $15,500.00 | $12,700.00 | $12,700.00 |
| 2368 | Clothing Allowance | $42,600.00 | $45,000.00 | $45,000.00 |
| 2379 | Emp Travel, Meet & Sem Expn | $3,550.00 | $3,350.00 | $3,350.00 |
| 2381 | Dues & Memberships | $1,365.00 | $1,480.00 | $1,480.00 |
| 2387 | Tuition & Training Expenses | $6,000.00 | $3,600.00 | $3,600.00 |
| 2402 | Build, Structures & Equip | $210.00 | $0.00 | $0.00 |
| 2407 | Furniture | $250.00 | $300.00 | $300.00 |
| 2420 | Spec Comm & Elec Equipment | $5,420.00 | $600.00 | $600.00 |
| 2501 | Bloodhound | $1,892.00 | $2,480.00 | $2,480.00 |
| 9999 | TOTAL OTHER EXPENSES | $154,151.00 | $146,443.00 | $146,443.00 |
| | AGENCY TOTAL | $2,280,766.00 | $2,445,168.00 | $2,445,168.00 |